**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
JAMES B. CONKLIN,

                                    Plaintiffs,

                -against-

COUNTY OF SUFFOLK, the SUFFOLK
COUNTY BOARD OF ELECTIONS, JESSE
GARCIA, in his Official and Individual
Capacity, CATHY L. RICHTER GEIER, in her
Official and Individual Capacity, and DENISE
A. WILSON, in her Individual Capacity,

                                    Defendants.
-----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
09-cv-3014 (ADS)(ETB)

**APPEARANCES:**

**Barnes & Barnes, P.C.**
*Attorneys for the Plaintiff*
1461 Franklin Avenue
Garden City, NY 11530
        By:     Robert M. Agostisi, Esq., Of Counsel

**Suffolk County Attorney Christine Malafi**
*Attorney for the Defendants the County of Suffolk,*
*the Suffolk County Board of Elections, and Cathy L. Richter Geier*
Suffolk County Attorney's Office
100 Veterans Memorial Hwy
POB 6100
Hauppauge, NY 11788-4311
        By:     Assistant Suffolk County Attorney Brian P. Callahan,
                Assistant Suffolk County Attorney Jennifer K. McNamara

**Garrett W. Swenson, Jr., Esq.**
*Attorney for the Defendant Jesse Garcia*
361 Clubhouse Court
Coram, NY 11727

**Nixon Peabody**
*Attorneys for the Defendant Denise A. Wilson*
50 Jericho Quadrangle
Farmingdale, NY 11735
    By:    Brian C. Avello, Esq.
          Joseph John Ortego, Esq.
          Kerry Ann Dinneen, Esq.
          Thomas M. Maliffe, Esq., Of Counsel

**SPATT, District Judge.**

This suit arises out of claims made by the Plaintiff, James B. Conklin, that he was sexually harassed by the Defendant Denise A. Wilson while an employee of the Suffolk County Board of Elections. In addition, Conklin claims that when he complained of this harassment, the Defendants the County of Suffolk, the Suffolk County Board of Elections, and Cathy L. Richter Geier (collectively, the "County Defendants"), as well as the Defendant Jesse Garcia, retaliated against him. Three separate motions for summary judgment have been filed by the Defendants. For the reasons set forth below, the Court grants the motions filed by individual Defendants Denise A. Wilson and Jesse Garcia, and grants in part and denies in part the motion filed by the County Defendants.

## I. BACKGROUND

### A. Factual Background

The Defendant Denise A. Wilson ("Wilson") began her employment with the Defendant the Suffolk County Board of Elections ("BOE") in the Processing Department in or about November 2005. The Plaintiff James B. Conklin ("the Plaintiff" or "Conklin") began his employment with the BOE as an Election Clerk in the Data Department on February 14, 2006. Wilson and Conklin became romantically involved prior to the time that the Plaintiff began his employment at the BOE. During the course of their relationship, the Plaintiff was married to another woman. It is undisputed that Wilson and Conklin were only co-workers and that Wilson

2

was not Conklin's supervisor, nor did she have the right to fire, hire, discipline, or control his work schedules or assignments. (Cty. Def.'s 56.1, at ¶ 3; Def. Wilson 56.1, at ¶ 3–4.)

It is not entirely clear when the relationship between Wilson and Conklin actually concluded. The Plaintiff purportedly terminated his relationship with Wilson in June 2007. However, Conklin acknowledged that he was still in love with Wilson for several months after this break up, until at least as late as November 2007. In this regard, in the beginning of November 2007, Conklin gave Wilson a card that said "I love you!" and was signed "Love, Jim" with an "X" and "O". (Cty. Def.'s 56.1, at ¶ 146.) Also, Mary MacConnell, the Plaintiff's social worker and therapist, testified about a visit with Conklin on September 10, 2007, as follows:

> A: Again, there was a never a total breakup. He worked with her.
> Q: In the next line [of your progress notes] you say he has obsessive thoughts?
> A: Yes.
> Q: And he feels she may be with another man.
> A: Right.
> Q: "He monitors her activities, calls frequently when not at work and tries to date her."
> A: Yes. He loved her. He loved her. Obsessive you think about it and think about it, could she have someone, could she have someone. Again, because of the fact that it wasn't totally ended, the hopefulness was there that it could be rekindled.

(MacConnell Dep., at 28-29.)

It appears that Wilson and Conklin had quite a tumultuous relationship, which manifested itself in various incidents both inside and outside of the workplace. Prior to November 7, 2007, the Plaintiff did not subjectively perceive Wilson's behavior or comments as harassing because, according to him, they were still friends at the time. (Conklin Dep., at 368.) However, an incident that took place on November 7, 2007 outside of the workplace demarcated a change in the Plaintiff's interpretation of Wilson's behavior.

On the evening of November 7, 2007, the Plaintiff approached the home of Donald Pipe, who was a friend and arguably a romantic interest of Wilson. According to Wilson, she was sitting on the couch with Pipe when she heard Conklin shouting and banging on the window. According to Conklin, he only peeked through the window and in doing so, saw illegal drugs strewn about the home. Wilson waited until she believed Conklin was gone from the home, and then left Pipe's residence and began to drive home. Soon thereafter, she noticed that the Plaintiff was following her automobile. Conklin admits that he followed Wilson's car from Patchogue to Bellport, which is the opposite direction from his home. However, he claims that he was following Wilson because she was swerving and he was worried about her safety, especially in light of the drugs he saw at Pipe's residence. Eventually, Wilson pulled into an empty gas station to allegedly get away from Conklin. However, the Plaintiff blocked Wilson's automobile, and in her attempt to escape, Conklin caused her to crash her car into a post at the gas station. The police subsequently arrested the Plaintiff and charged him with two crimes: harassment and reckless endangerment. After this incident, Conklin claims that he received angry and threatening messages from Pipe. Conklin reported these threats to the authorities, which led to Conklin's receipt of an order of protection against Pipe on November 13, 2007.

According to the Plaintiff, from November 7, 2007 onward, he no longer wanted anything to do with Wilson. (See Pl. Opp. Mem., at 4 ("On November 7, 2007, Conklin's friendship and overall rapport with Wilson began to deteriorate quickly").) After this point in time, Conklin began to subjectively perceive Wilson's behavior and comments as harassing and thus, on numerous occasions, he began to make complaints that Wilson was bothering him. The County Defendants acknowledge that the "harassment" Conklin began to complain about consisted of Wilson using a copy machine in Conklin's work area in the Data Department;

putting her lunch in the refrigerator in Conklin's work area; using a phone in Conklin's work area; and returning things to him after their relationship was over. (Cty. Def.'s 56.1., at ¶ 140.)

In addition, Conklin alleges that Wilson's harassment also included frequent use of the water cooler in his area; intentional use of his desk to read her newspaper; leaving unnecessary notes for him at his workspace; and making passing, derogatory comments to him about his wife. (Pl. 56.1, at ¶ 140.) Furthermore, while walking outside the BOE building, Conklin alleges that Wilson yelled at him and hit him. However, Wilson never touched the Plaintiff in an inappropriate way in the workplace, and never made any physical sexual advances toward him at the BOE. (Pl. 56.1, at ¶ 206.) Moreover, Conklin has acknowledged that part of what formed his belief that he was being sexually harassed by Wilson was "because many of the times she would say stuff to me about the relationship and starting it up again, and that's sexual harassment." (Conklin Dep., at 176:7-11.)

On the other hand, Wilson testified that she had alternative reasons for her behavior and that she did not intend to harass the Plaintiff. In general, Wilson characterizes the office environment as "fluid"; she asserts that while there are different departments, people moved around frequently and work space and resources were often shared. (Wilson Mem. at 4.) For example, Wilson claims she used the refrigerator in the data department because it was close to her desk and everyone else used it too; she used the water cooler in the data department because she contributed money for the water supply; she used the copy machine in the data department because she did not have one in the processing department where she worked; and she used the phones in the data department because the phones in her department only dialed internal County numbers. (Wilson Dep., at 136-39.) In addition, Wilson obtained an Order of Protection against the Plaintiff on November 20, 2007, because "he ran [her] off the road, I had enough of the

stalking, the violence and the erratic behavior." (Wilson Dep., at 100.) In particular, Wilson testified that she was in "fear for her life" based upon Conklin's actions on November 7, 2007.

The Plaintiff complained about Wilson's behavior to Keith Tuthill, BOE's Director of Operations, and Wayne Rogers, Deputy Commissioner. As a result, Tuthill and Rogers told Wilson not to go into Conklin's workspace in the Data Department. In addition, the Plaintiff observed Tuthill speak to Wilson on at least two occasions in November 2007. (Cty. Def.'s 56.1, at ¶ 170.) However, according to Conklin, Wilson repeatedly violated this prohibition, and the BOE never instituted progressive discipline against Wilson for her infractions. (Pl. 56.1, at ¶ 175.) Thus, Conklin contends that his complaints were not addressed reasonably and/or satisfactorily by the Defendants.

The Plaintiff also alleges that after the November 7, 2007 incident, he also reported Wilson's conduct to the Defendant Jesse Garcia. Garcia works at the BOE as the Republican Hispanic Outreach Coordinator and also, according to Conklin, as the Republican "Election Administrator". (Def. Wilson 56.1, at ¶ 7.) Garcia denies that he served in a supervisory position at the BOE, and testified that he has nobody who reports to him there. However, the Plaintiff contends that "Garcia is (in reality) third in the BOE hierarchy, after only the Republican Commissioner and Deputy Commissioner." (Pl. 56.1, at ¶ 7.) In addition, the Plaintiff asserts that as a political leader with the County generally, Garcia has broad powers within the BOE, such as the decisions as to promotions; controlling BOE workers' terms and conditions of employment; and countermanding and cancelling personnel actions ordered by the Commissioner such as transfers and terminations. (Pl. 56.1 at ¶ 7.) After Conklin spoke to Garcia about Wilson's behavior, Conklin claims that Garcia loudly berated him for his decision

to complain about Wilson's harassment and allegedly told Conklin that there would be consequences if he continued to pursue his sexual harassment claim against her.

On February 29, 2008, the Plaintiff made a request for information on how to file a complaint of sexual harassment to Betty Manzella, the Republican BOE's sexual harassment officer. On March 6, 2008, Manzella responded to the Plaintiff's request. On or about May 15, 2008, the Plaintiff submitted a complaint to Manzella, who then contacted the Democratic sexual harassment officer, Jeanne O'Rourke. On May 19, 2008, Manzella and O'Rourke ("the sexual harassment officers") met with Conklin to explain the process of filing a complaint of sexual harassment. In late May or early June 2008, the BOE interviewed the Plaintiff, which the County Defendants claim was the start of its internal investigation into Conklin's complaints. The Plaintiff disputes whether the sexual harassment officers ever conducted anything that resembled a true "investigation" of his claims. The BOE disagrees, claiming that it conducted a full investigation, including that the sexual harassment officers met with Wilson twice in relation to the complaint that Conklin filed against her.

There is no dispute that during the investigation in April 2008, the Plaintiff was directed by Defendant Geier to move out of the Data Department to a different position in the warehouse area. The Plaintiff worked in the warehouse for a total of approximately three months, from May to August of 2008. The reason for this reassignment is disputed by the parties. The County Defendants assert that Conklin was directed to move as a result of a complaint filed by a non-BOE employee named Amy Connelly. Allegedly, Connelly complained to the BOE that Conklin had retrieved her address from the BOE database — specifically, voter registration information — and went to her home to confront her husband John Connelly about his prior involvement with Wilson. (Cty. Def.'s 56.1, at ¶ 227-29.) The Defendants based this conclusion upon a

computer query that was made into the voter records that they believed was "evidence" of Conklin's alleged computer misuse. Thus, it is asserted that Conklin was moved to the warehouse because the BOE did not want him to have further access to a computer. (Cty. Def.'s 56.1, ¶ 241.) However, other BOE employees such as Tuthill and Ellis testified that Conklin's move was attributable to his attendance record. (Tuthill Dep. at 25; Ellis Dep. at 27:9-25, 28:2-4.) In addition, the Plaintiff's supervisor when he was assigned to the Data Department, the Defendant Geier, testified that she was displeased with Collins' work performance, specifically his attendance, prior to his being moved to the warehouse in 2008. (Geier Dep. at 84:14-25; 85, 86:2-5.)

The Plaintiff disputes the Defendants' alleged proof of his computer misuse, arguing that the computer query was generated one month after his relocation to the warehouse and precisely one day after he filed his formal complaint of sexual harassment. Moreover, the Plaintiff vehemently disputes that the transfer to the warehouse was triggered by Connelly's complaint, and instead asserts that the move was caused by his prior complaints regarding Wilson's harassment. (Pl. 56.1, at ¶ 229.) In this regard, the Plaintiff contends that if the decision to move him to the warehouse was motivated solely by the desire to eliminate his access to a computer, then there was no reason to begin monitoring his whereabouts in the warehouse once he was transferred. (Pl. 56.1, at ¶ 211.) In addition, the Plaintiff asserts that his attendance was not a legitimate reason for the move, because his attendance at that time was substantially similar to his prior attendance record at the BOE. (Pl. 56.1, at ¶ 210.)

Moreover, the parties dispute the characterization of this reassignment. The County Defendants categorize it as "in the nature of a transfer, not a demotion." (Cty. Def.'s 56.1, at ¶ 238.) However, the Plaintiff asserts that it did constitute a demotion, because he was moved to

an area that primarily involved blue collar work, entailed a significant loss of prestige and status, and was also inconsistent with his prior experience and professional background. (Pl. 56.1, at ¶ 238.) Conklin acknowledges that Wilson no longer harassed him in his workspace after he was moved to the warehouse, although she allegedly continued to bother him in other locations in the BOE building, such as to making comments in the hallways designed to rekindle their relationship. (Pl. 56.1, at ¶ 251-52.)

In Conklin's employ at the warehouse, his hours, pay and benefits remained the same. In this position, the Plaintiff reported to Bill Ellis, who at that time was supervisor of the warehouse but currently serves as Deputy Commissioner. Geier advised Ellis about the move when it was initiated and asked him to monitor the Plaintiff's whereabouts. (Ellis Dep. at 28.) When Conklin began working at the warehouse, Ellis advised him that he would have two ten minute breaks and one half-hour lunch break. The Plaintiff asserts that Ellis also told him that these rules would apply to Conklin only, even if they did not apply to other warehouse employees. (Pl. 56.1, at ¶ 237.)

Meanwhile, on June 17, 2008, O'Rourke and Manzella sent a letter to the Plaintiff stating that they were unable to proceed with an investigation of his claims against Wilson because of Conklin's failure to file a sufficiently detailed complaint and because his allegations did not fit within the County's definition of sexual harassment. (Def. Wilson 56.1, at ¶ 162.) To the contrary, the Plaintiff asserts that his complaint was sufficiently detailed and he also disputes whether his allegations fit within the definition of sexual harassment pursuant to the County's standard operating procedure. The County asserts that its definition of sexual harassment was only "unwelcome sexual advances, requests of sexual favors and other verbal or physical

conduct of a sexual nature. . . ." (Cty. Def.'s 56.1, at ¶ 167.)  However, the Plaintiff asserts that the County's definition also contemplates "verbal or physical conduct of a sexual nature when . . . [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  (See Pl. Ex. 8 at 3B; 9 at 1.)

The Plaintiff was given another opportunity to provide more detailed information to the sexual harassment officers.  Thus, Manzella and O'Rourke met with Conklin several times for this purpose, including a meeting on July 22, 2008.  According to the Plaintiff, during the course of these meetings, the sexual harassment officers attempted to persuade him to drop his complaint against Wilson and repeatedly spoke to him without his attorney present.  (Pl. 56.1, at ¶ 170.)  However, the County Defendants deny these allegations and claim that at one meeting Conklin yelled at them and stormed out of the meeting.  (Cty. Def.'s 56.1, at ¶ 170.)

The Plaintiff was eventually sent a letter on August 7, 2008, advising him that in the absence of further specific information, the BOE would take no further action on his complaint. (Cty. Def.'s 56.1, at ¶ 225.)  Thereafter, the Plaintiff's case was closed for failure to file a detailed complaint setting forth specific allegations of sexual harassment.  According to Conklin, the complaint was closed only because the BOE "wanted it to go away" and because it wanted him to "drop it".  (Conklin Dep., at 184, 185.)

During the course of the investigation, which was simultaneous with the Plaintiff's time at the warehouse — from May 12, 2008 through August 20, 2008 — Ellis kept a log of the Plaintiff's whereabouts.  The log indicates that Conklin had sporadic attendance and failed to notify Ellis of his absences.  The Plaintiff does not dispute the accuracy of these records, but asserts he used his accrued time in connection with the continued harassment he endured from

Wilson. Ellis testified that when he spoke to Conklin regarding his attendance records, Conklin replied that he had "doctors and lawyers appointments and never knows when he can come in." (Ellis Dep., at 32:21-25.) Ellis also met with Commissioner Geier at one point to discuss the Plaintiff's attendance issues.

On August 20, 2008, Defendant Geier terminated the Plaintiff. Geier maintains that she only consulted her Deputy Commissioner Wayne Rogers regarding the decision, although the Plaintiff claims she also consulted with Defendant Jesse Garcia. Some of stated reasons for the Plaintiff's termination were that he had an erratic schedule and that he used a BOE computer to get information that was not used for BOE purposes. (Cty. Def.'s 56.1, at ¶ 259.) The Plaintiff contends that his termination was solely motivated by retaliation for his filing a sexual harassment complaint against Wilson.

**B. Procedural History**

The Plaintiff commenced this action on July 15, 2009, asserting causes of action against the County of Suffolk, the Suffolk BOE, Cathy L. Richter Geier, in her official and individual capacity, Jesse Garcia, in his official and individual capacity, Denise A. Wilson, in her official and individual capacity, and Chris P. Termini, in his official and individual capacity. The Plaintiff asserted claims for retaliation and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1983 ("Section 1983"), and the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 296.

On September 14, 2009, two of the defendants, Denise A. Wilson and Chris P. Termini, filed a motion to dismiss the claims alleged against them. On May 8, 2010, this Court issued a decision that granted the Defendant Termini's motion to dismiss all of the Plaintiff's claims against him, and granted the Defendant Wilson's motion to dismiss the Plaintiff's Section 1983

claims against her as well as the NYSHRL claims against her, but only in her official capacity.

On September 19, 2011, all of the remaining defendants filed motions for summary judgment.

Three separate motions were filed by the following Defendants: (1) one motion was filed by the

County of Suffolk, the Suffolk BOE, and Geier (collectively, the "County Defendants"); (2) one

motion was filed by Wilson; and (3) one motion was filed by Garcia. The Court will address

each motion in turn.

## II. DISCUSSION

### A. <u>Legal Standards on a Motion for Summary Judgment</u>

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material"

within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the

suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> In determining whether an

issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits,

interrogatory answers, and depositions must be viewed in the light most favorable to the party

opposing the motion." <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 202 (2d Cir. 1995) (citing

<u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per

curiam), and <u>Ramseur v. Chase Manhattan Bank</u>, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward

with specific facts showing that there is a genuine issue for trial.'" <u>Matsushita Elec. Indus. Co.</u>

v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting

Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot survive summary judgment by

casting mere "metaphysical doubt" upon the evidence produced by the moving party.

Matsushita, 475 U.S. at 586, 106 S. Ct. 1348. Summary judgment is appropriate when the

moving party can show that "little or no evidence may be found in support of the nonmoving

party's case ." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994)

(citations omitted).

## B. **As to the Summary Judgment Motion by the County Defendants**

The Court will first address the motion for summary judgment filed by the Defendants

the County, the BOE, and Geier, in both her individual and official capacity (collectively, the

"County Defendants"). The County Defendants move for summary judgment as to both the

Defendants' hostile work environment and retaliation claims, which are asserted under Title VII,

Section 1983, and the NYSHRL.

The standards for evaluating claims arising under Title VII, Section 1983, and the

NYSHRL are identical for both hostile work environment and retaliation claims. See Weinstock

v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Smith v. Town of Hempstead Dep't of

Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) (Spatt, J.) ("The

standard for showing a hostile work environment under Title VII, Section 1981, Section 1983,

and the New York State Human Rights Law is essentially the same."); Davis v. Oyster Bay-East,

No. 03 Civ. 1372, 2006 WL 657038, at *8, n.12 (E.D.N.Y. Mar. 9, 2006), aff'd, 220 Fed. App'x.

59 (2d Cir. 2007) ("discrimination claims under Title VII, 42 U.S.C. §§ 1981 and 1983, and

NYHRL § 296 are analyzed together, as the same analytic framework applies to each").

With regard to Title VII, only the County and the BOE may be held potentially liable, because individual defendants such as Geier may not be held personally liable for alleged violations of this statute. However, under certain circumstances, an employee may be held individually liable under Section 1983 and NSYHRL. See, e.g., Chamblee v. Harris & Harris, Inc., 154 F. Supp. 2d 670, 676-77 (S.D.N.Y. 2001) (noting that an employee may be held individually liable under NYSHRL if he has "sufficient authority and power to do more than simply carry out personnel decisions made by others").

**1. As to the Hostile Work Environment Claims**

In addition to his claims for retaliation, the Plaintiff also asserts that he was subjected to unlawful discrimination and harassment in and through the creation of a severe and pervasive hostile work environment that substantially interfered with his employment, in violation of Title VII, Section 1983, and NYSHRL. As with retaliation, all three causes of action are subject to the same analysis. See Smith, 798 F. Supp. 2d at 451 ("The standard for showing a hostile work environment under Title VII, Section 1981, Section 1983, and the New York State Human Rights Law is essentially the same.").

> To state a claim for hostile work environment in violation of Title VII [or Section 1983 or NYSHRL], a plaintiff must plead facts that would tend to show the complained of conduct: (1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex.

Patane, 508 F.3d at 113 (internal quotation marks and punctuation omitted), citing Gregory v. Daly, 243 F.3d 687, 691–92 (2d Cir. 2001). These three elements are termed, respectively, the objective, subjective, and prohibited causal factor requirements. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Gregory, 243 F.3d at 691-92.

In general, to prevail on a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotations omitted). In determining whether a work environment is hostile, the Court applies a standard with both an objective and subjective component, and assesses the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 119 (2d Cir. 2010) (internal quotation marks omitted); accord Petrosino v. Bell Atl., 385 F.3d 210, 221 (2d Cir. 2004).

In the present case, the Court finds that the record is insufficient, as a matter of law, to permit a reasonable fact finder to identify a hostile work environment based on sex that altered the Plaintiff's conditions of employment.

First, regardless of whether the conduct was based upon Conklin's gender, Wilson's behavior did not rise to the level of severity required to sustain a hostile work environment claim. Although the conduct at issue may have been pervasive, as the Plaintiff alleges that the Defendant Wilson sometimes passed by his desk to use the photocopy machine or the water cooler up to ten days per day, these types of mundane and routine workplace actions are too trivial to constitute harassment as a matter of law. See Danzy v. Chao, 177 Fed. App'x 133, 135 (2d Cir. 2008) ("Danzy failed to make out a hostile work environment claim as the actions she alleged concerned only annoyances and personal disagreements and are therefore insufficient to show that her work environment 'was so severely permeated with discriminatory intimidation,

ridicule, and insult that the terms and conditions of her employment were thereby altered.'"). Cf

Vito v. Bausch & Lomb Inc., 403 Fed. App'x 593, 596 (2d Cir. 2010) (finding allegations that a

supervisor's "right hand slipped down and touched her right breast" and made irritating and

inappropriate comments, to fall short of the severity necessary to sustain a hostile work

environment claim).

In addition, the Plaintiff has failed to specify many of the allegedly derogatory comments

that were supposedly made by Wilson. (See, e.g., Conklin Dep. at 157 ("She would sometimes

come in and just say something, a little dagger, and then she would scurry for the door"); id. at

206 ("Lots of times she would talk to me. She would say something derogatory").) With regard

to alleged comments that were made to rekindle their romantic relationship, such as Wilson

commenting on "where [he] was and who [he] was hanging out with," (id. at 328) although

arguably inappropriate, none of these statements are sufficient to show that the Plaintiff's work

environment was severely permeated with discriminatory intimidation and ridicule.

As recently held by the Second Circuit, "the record indicates only limited, infrequent, and

at worst, mildly offensive conduct falling well short of the severity and frequency required to

raise a triable issue of fact as to the existence of an objectively hostile work environment."

Cristofaro v. Lake Shore Cent. Sch. Dist., No. 11 Civ. 1025, 2012 WL 1082567, at *2 (2d Cir.

Apr. 2, 2012). For example, in Cristofaro, the Second Circuit found the following to be

insufficient:

> In support of her hostile environment claim, Cristofaro points to
> evidence dating from 1999 and continuing through 2006 that
> Redman: (1) occasionally commented on Cristofaro's physical
> appearance; (2) participated in a bet with three other male
> employees as to when Redman would be able to engage
> Cristofaro in sexually explicit conversation; (3) once made a non-
> sexual sarcastic or derogatory remark to Cristofaro in front of a
> colleague; (4) beckoned to Cristofaro in the halls by yelling

> "hey," curling his finger in her direction, and engaging her in conversation unrelated to her work once a month for three-and-a-half years; (5) threw a piece of paper at Cristofaro in a faculty meeting; (6) lied about Cristofaro to a colleague; and (7) briefly made contact with the side of her body while standing next to her. . . . At the same time, Cristofaro testified that Redman never touched her in a sexual or suggestive manner, and never asked her out or to engage in sexual acts with him.

Id. The circumstances here are, at most, equal to the severity found to be insufficient in Cristofaro.

In the present case, the vast majority of the incidents which Conklin complains about are, at most, objectively annoying. While Conklin may have subjectively found the behavior to be harassing, that does not end the relevant inquiry because the conduct must be objectively hostile as well. There is no doubt that Conklin's employment situation may have been unpleasant, but this does not rise to the level of an illegal hostile environment. The "standard for redress is a hostile work environment, not an unpleasant one." Nettle v. Central Okla. Am. Indian Health Council, Inc., 334 Fed. App'x. 914, 925-26 (10th Cir. 2009). See, e.g., Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 788 (8th Cir. 2007) (finding that the plaintiff's allegations "amount[ed] to a frustrating work environment rather than an objectively hostile work environment"); Smith v. Naples Community Hosp., Inc., No. 208 Civ. 952, 2010 WL 2026163, at *7 (M.D. Fla. May 20, 2010) ("much of the conduct plaintiff alleges was harassment was in fact annoyances and communication issues that do not come close to creating a hostile work environment").

Second, even if the conduct at issue did rise to the requisite level of severity, "it is axiomatic that in order to establish a . . . hostile work environment . . . a plaintiff must demonstrate that the conduct occurred because of [his] sex." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). "[M]istreatment at work, whether through

subjection to a hostile environment or through such coercive deprivations as being fired or being

denied a promotion, is actionable . . . only when it occurs because of an employee's sex, or other

protected characteristic." Brown, 257 F.3d at 252 (citing Oncale v. Sundowner Offshore Servs.,

Inc., 523 U.S. 75, 79-80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)); see also Hayut v. State Univ.

of New York, 352 F.3d 733, 744-45 (2d Cir. 2003) (requiring "evidence that the alleged

discrimination was carried out because of sex" in a sexual harassment claim under 42 U.S.C.

§ 1983, governed by "traditional Title VII 'hostile environment' jurisprudence"); Galdieri-

Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) ("Although the

harassment need not take the form of sexual advances or explicitly sexual conduct in order to be

actionable under Title VII, the plaintiff is required to establish that the harassment complained of

was based on [his] gender.") (internal citations omitted). "In order to show that the allegedly

harassing conduct was motivated by gender, or that gender played a motivating part in an

employment decision, a [ ]male plaintiff must show that one of the reasons for the harassment or

the decision was that [ ]he was a []man." Galdieri-Ambrosini, 136 F.3d at 289 (internal

quotation marks omitted). In the end, what matters is "how the employer would have treated the

plaintiff had [ ]he been of a different sex." Brown, 257 F.3d at 254 (emphases omitted).

After examining Conklin's allegations, it appears that he does not contend that he was

subjected to an unpleasant work atmosphere in any way because he is a man. Rather, his

complaint is primarily that he was the recipient of allegedly hostile behavior at the hands of

Wilson because she was bitter about the end of their relationship and perhaps wanted to rekindle

their romance. (See Pl. Opp. at 31 ("Wilson's closely-connected feelings of love and hate for

Conklin . . . caused her to initiate a pattern of harassing and disruptive conduct that interfered

with his job performance at the BOE."); (id. at 32 ("they were motivated by Wilson's desire to,

on one hand, retaliate against Conklin for ending their relationship, and, on the other, to persuade him to resume it.").)

Thus, the incidents that Conklin claims demonstrate a hostile work environment amount to, at most, workplace annoyances and aggravation that are divorced from any discriminatory motive. The events were almost exclusively facially neutral incidents in no way based upon Conklin's sex. See Guarino v. St. John Fisher College, 321 Fed. App'x 55, 56 (2d Cir. 2009) (concluding that although a supervisor may have had an obsession with the plaintiff, seeking her out continuously during her employment, and "may have been acting in an unwelcome and inappropriate manner, no reasonable fact-finder could conclude that her behavior occurred because of her sex."). While facially neutral incidents may be considered "among the 'totality of the circumstances' . . . in any hostile work environment claim," there must be a "circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." Alfano, 294 F.3d at 378; see also Oncale, 523 U.S. at 80–81 (cautioning that Title VII does not establish a "general civility code" for the American workplace). The Court finds no such basis to exist here.

Of importance, courts often find that harassment by a co-worker is not considered to be "based on sex" when it arises from a failed relationship. See, e.g., Succar v. Dade County Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) ( "Lorenz's harassment of [plaintiff] was motivated not by his male gender, but rather by Lorenz's contempt for [plaintiff] following their failed relationship; [plaintiff's] gender was merely coincidental."); Galloway v. Gen. Motors, 78 F.3d 1164, 1168 (7th Cir. 1996); Doherty v. Nederlander Producing Co., No. 04 Civ. 3324, 2006 WL 2239421, at *5, 2006 U.S. Dist. LEXIS 54125, at *16 (S.D.N.Y. Aug. 4, 2006) ("However, she fails to allege or to proffer evidence that the impetus for this behavior was gender-based hostility.

Rather, she acknowledges that she had been personally involved with Johnson, that she had terminated their relationship, and she alleges that his conduct stemmed from his frustration regarding the termination of their consensual personal relationship."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 263 (E.D.N.Y. 2005) ("Conduct motivated by personal animosity does not run afoul of Title VII's prohibition against altering the terms and conditions of employment because of sex . . . ."). But see Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007) ("In cases involving a prior failed relationship between an accused harasser and alleged victim, reasoning that the harassment could not have been motivated by the victim's sex because it was instead motivated by a romantic relationship gone sour establishes a false dichotomy. Presumably the prior relationship would never have occurred if the victim were not a member of the sex preferred by the harasser, and thus the victim's sex is inextricably linked to the harasser's decision to harass.").

In this case, characterization of the alleged harassment as merely personal animosity seems appropriate under the circumstances. Conklin's description of their relationship is largely corroborated by undisputed evidence that he and Wilson had an on-again, off-again relationship punctuated by periods of hostility. The alleged conduct in itself — including derogatory comments about Conklin's wife, incidents regarding Wilson's new boyfriend, and comments indicating a desire to resume the relationship — also indicates that Wilson was motivated by frustration about the failed relationship. It appears evident that the claimed harassment at issue here was based on personal animosity, rather than a protected characteristic such as sex or race.

Finally, the Court notes that the Plaintiff conveniently began to subjectively feel that he was being harassed the day that his relationship with Wilson went sour. This is not to say that a previous romantic relationship with Wilson prevents Conklin from having a now viable hostile

work environment claim.  See Forrest, 511 F.3d at 230 ("Nowhere does prior case law suggest that certain types of discriminatory behavior, held to constitute gender-based harassment in other cases, may not constitute gender-based harassment when the parties had previously engaged in a romantic relationship."); accord Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1157 (S.D.N.Y. 2003) ("Boiled down to its essence, [defendant's] argument would mean that once a supervisor has engaged in a consensual relationship with an employee, he subsequently has carte blanche to harass that employee with impunity, even though the same behavior with respect to any other employee would constitute a Title VII violation.  This argument makes little sense — prudentially or legally — and the Court rejects it.").

However, the natural discomfort that arises when a romantic relationship ends will often result in behavior and consequent emotions that are in no way connected to discriminatory intent and thus do not constitute harassment based upon gender unless there is a specific basis for the Court so to conclude.  See Stepheny, 356 F. Supp. 2d at 263 ("If the jilted lover seeks retribution through actions that are not gender- or race-based, Title VII is not implicated.  If the conduct is gender- or race-based, it is.").

Therefore, because the Court finds that as a matter of law there was no hostile work environment, the Court need not analyze whether these claims may be imputed to either the employer or to any individual defendants.  Accordingly, to the extent the Plaintiff's Section 1983, Title VII, or NYSHRL claims are premised on a hostile work environment theory, the County Defendants' motion for summary judgment is granted and such claims are dismissed.

### 2.  As to the Retaliation Claims

The Plaintiff alleges that the County, the BOE, and the individual Defendants have, while acting under color of state law, deprived him of his constitutional rights as secured by the First

Amendment, in violation of 42 U.S.C. § 1983. In addition, he claims that he was demoted, suspended, and ultimately discharged in retaliation for his participation in protected activities, such as his complaints of Wilson's alleged harassment, in violation of Title VII. Finally, the Plaintiff claims he was subjected to unlawful retaliation in and through the adverse employment actions he suffered due to his participation in protected activities, in violation of NYSHRL.

In essence, the Plaintiff claims that he was demoted via his transfer to the warehouse and then ultimately terminated because of his complaints regarding Wilson's alleged sexual harassment. The Defendants argue that the Plaintiff's retaliation claims relating to his supposed demotion and subsequent termination fail as a matter of law because (1) he cannot show a causal connection between his protected activity and the adverse employment actions; and (2) the undisputed facts demonstrate that he was transferred and then terminated for legitimate, non-retaliatory reasons. For the reasons set forth below, the Court finds that summary judgment on these claims is unwarranted.

As mentioned above, the Plaintiff alleges retaliation under the rubrics of Title VII, Section 1983, and NYSHRL. All of these claims are analyzed pursuant to the familiar three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and thus all three claims will be assessed simultaneously. In summary form, the McDonnell Douglas test requires that, first, the plaintiff establish a *prima facie* case of retaliation. See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932–33 (2d Cir. 2010) (describing the McDonnell-Douglas burden shifting test in the context of a retaliation claim). To establish a *prima facie* case of retaliation, the plaintiff must:

> adduce evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the

> plaintiff, and (4) that a causal connection exists between the
> protected activity and the adverse action, i.e., that a retaliatory
> motive played a part in the adverse employment action.

Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006).  If there

is no direct evidence of retaliatory animus, proof of causation may be shown indirectly, such as

by demonstrating temporal proximity between the protected conduct and the alleged retaliatory

action.  Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); Cifra v. GE, 252

F.3d 205, 217 (2d Cir. 2001) ("[T]he causal connection needed for proof of a retaliation claim

'can be established indirectly by showing that the protected activity was closely followed in time

by the adverse action.'") (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.

1996) (internal citation omitted)).  Then, if the plaintiff establishes a *prima facie* case of

retaliation, the burden shifts to the defendant to produce a non-retaliatory reason for the allegedly

adverse action.  Id.

Finally, if the defendant satisfies this burden of production, the plaintiff again has the

burden of showing, through more than mere temporal proximity, that "more likely than not the

employer's decision was motivated, at least in part, by an intent to retaliate against him."  El

Sayed, 627 F.3d at 933 ("The temporal proximity of events may give rise to an inference of

retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but

without more, such temporal proximity is insufficient to satisfy appellant's burden to bring

forward some evidence of pretext."); see Patterson v. County of Oneida, N.Y., 375 F.3d 206, 221

(2d Cir. 2004) (noting that the burden shifts back to the plaintiff to demonstrate by competent

evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were

a pretext for discrimination.").

If a retaliatory motive played *any* part in the adverse employment actions, even if there were other objectively valid grounds, the law is violated. Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (citing Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986)). "Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000) ("once the employer has proffered a reason for its action, all presumptions and special rules drop away; a case under Title VII becomes like any other case in that the plaintiff, in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim").

In order to meet this burden, a plaintiff may rely on evidence presented to establish his *prima facie* case, as well as additional evidence such as direct or circumstantial evidence of retaliation. Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003); LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 174 (2d Cir. 1995) ("Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the *prima facie* case, without more . . . .") (internal citation and quotation omitted). In some circumstances, a plaintiff may merely demonstrate that he satisfies McDonnell Douglas's minimal requirements of a *prima facie* case and to put forward evidence from which a factfinder could find that the employer's explanation was false, when it gives "powerful evidence of discrimination — more than enough to sustain a plaintiff's verdict." James, 233 F.3d at 154. However, there are other cases in which "the two together might fall far short of providing evidence from which a reasonable inference of discrimination could be drawn." Id.

"[T]he key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination." Rodriguez v. City of New York, 644 F. Supp. 2d 168, 184 (E.D.N.Y. 2008). "[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove — particularly discrimination." James, 233 F.3d at 157; see also Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion."). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Patterson, 375 F.3d at 221 (quoting Texas Dep't of Cmty. Affairs, 450 U.S. at 253, 101 S. Ct. 1089).

"'Thus, unless the employer has come forward with evidence of a dispositive non-retaliatory reason 'as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a [non-retaliatory] reason reflects a question of fact to be resolved by the factfinder after trial.'" LaFond, 50 F.3d at 174-75 (quoting Cronin, 46 F.3d at 203).

### a. As to a *Prima Facie* Case

In the present case, there does not appear to be any dispute that Conklin engaged in protected activity when he informally complained about Wilson's behavior, as well as when he formally filed a sexual harassment complaint with his employer. Moreover, it does not appear to be contested whether Conklin's employer — the County and specifically the BOE — were aware

of this activity. In addition, there is no dispute between the parties as to whether Conklin's termination constituted an adverse employment action. While the parties' 56.1 statements take pains to characterize the Plaintiff's move to the warehouse categorically as either a demotion or a mere transfer, the County Defendants' motion does not argue that this incident does not constitute an adverse employment action. Therefore, for purposes of the present motions, the Court will presume that this incident does qualify as an adverse employment action.

With regard to causal connection, the Plaintiff largely relies on temporal proximity. Conklin asserts first, that most of the relevant events happened within a time frame of only five and a half months, which is the span of time between the initiation of the complaint procedures on February 29, 2008 and his termination on August 20, 2008. He claims that this fact alone demonstrates sufficient temporal proximity for purposes of the causation analysis. Further, the Plaintiff argues that even if the Court rejects this period of time as establishing sufficient temporal proximity, he can still establish an inference of causation because the Court can merely view a portion of his contentions — namely, the initiation of the sexual harassment complaint procedure on February 29, 2008 and his demotion to the warehouse on or about April 15, 2008 — as a mere one month gap that would be sufficient to promote an inference of causation.

The Defendants dispute that the Plaintiff has met his burden of presenting a *prima facie* case sufficient to oblige it to explain its adverse actions. See Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 380 (2d Cir. 2001). Specifically, the Defendants contend that the Plaintiff is unable to sustain his initial burden of demonstrating a causal connection. However, this argument is unavailing because the evidence necessary to satisfy the Plaintiff's initial burden is "minimal" and "de minimis." See id. With regard to the establishment of a *prima facie* case through temporal proximity, the Second Circuit has not drawn a bright line as to how closely an

adverse employment action must follow protected activity to imply that retaliation has taken place. See, e.g., Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (citing Gorman–Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001)).

While some courts within this Circuit have held that a three month gap is insufficient to show a causal connection, others have found that a separation of as much as eight months will permit an inference of causation. Id. (citing Hollander v. American Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir. 1990) and Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45–46 (2d Cir. 1980)). The Court finds that the sequences of events alleged in this particular case, beginning with Conklin's initial complaints of Wilson's behavior and the filing of a formal complaint, to the BOE's transfer of the Plaintiff to the warehouse and his subsequent termination, all happened within such a limited time frame that a *prima facie* case is established.

### b. The Defendants' Articulated Reasons

The County Defendants argue that even if the Plaintiff has pled a *prima facie* case of retaliation, they have articulated a legitimate, non-retaliatory reason for the claimed adverse employment actions. In particular, the County Defendants assert that "[t]he record regarding Plaintiff's insubordination, abysmal attendance record as well as numerous attendance counseling meetings stands as an overwhelmingly legitimate nondiscriminatory reason as to why plaintiff was terminated." (Cty. Def.'s Motion at 12.)

In this regard, the Defendants have submitted ample evidence indicating the Plaintiff's poor attendance record at the BOE. In the County Defendants' Local Rule 56.1 Statement, through approximately 100 numbered paragraphs which are largely undisputed and corroborated by Conklin's deposition transcript, the Defendants describe that, beginning in 2008, the Plaintiff did not work the required hours of Monday through Friday from 9:00 am to 4:30 pm with two

ten minute breaks and one half-hour lunch period. For example, the Plaintiff admits that for the work period from February 11, 2008 through July 27, 2008, he did not ever work a normal seven-hour day. (Cty. Def.'s 56.1, at ¶ 37, 57, 72, 91.) In addition, Conklin admitted in his deposition that he "had a problem with absenteeism and lateness toward the end of his employment" at the BOE. (Conklin Dep. at 553:9-11.) See Davis v. Moore Wallace, Inc., 217 Fed. App'x. 313 (5th Cir. 2007), aff'g No. 05 Civ. 57, 2006 WL 722217, 2006 U.S. Dist. LEXIS 15652 (E.D. Tex. March 15, 2006) (finding a failure to abide by employer's attendance policy to be legitimate grounds for plaintiff's termination). Therefore, the Defendants have articulated a legitimate and non-retaliatory reason for the Plaintiff's termination.

Moreover, the Defendants explain that the reason for transferring the Plaintiff to the warehouse and part of the reason for his eventual termination was the inappropriate accessing of computer records from the voter database in connection with Amy Connelly, as described above. (See O'Rourke Dep., at 99 (responding to why she believed Mr. Conklin was terminated by stating there were "a number of reasons", including that she "became aware that he was — had used a computer to get information that was not used for Board purposes.").) The Plaintiff does not deny that it is possible he accessed the voter registration information for John Connelly, but that it conceivably could have been someone else if they had his password. In any event, the Plaintiff disputes that he did so inappropriately because he did it at Wilson's request. (Conklin Dep., at 868.)

More importantly, Conklin contends this could not be a legitimate reason for his move to the warehouse because the computer query offered by the Defendants as evidence was generated one month *after* his relocation to the warehouse and that this "proof" of his access is particularly suspicious in light of the fact that it was generated precisely one day after he filed his formal

complaint of sexual harassment. On the other hand, Geier testified that she may have had the report printed a second time, and that explains why the date on the report post-dates Conklin's move to the warehouse. Therefore, there is a question of fact as to whether the articulated reason for the Plaintiff's move to the warehouse is legitimate.

### c. Whether the Stated Reasons are Pretextual

Even assuming that the Defendants have articulated legitimate non-retaliatory reasons for both the Plaintiff's move to the warehouse and for his termination, the Court finds that there are sufficient questions of fact as to whether these reasons are pretextual, and were made in order to defeat the Defendants' motion for summary judgment as to the Plaintiff's retaliation claims.

With respect to his termination, the Plaintiff's poor attendance record is undisputed, but the Plaintiff asserts it was consistently poor for a substantial period of time both before his move to the warehouse and afterwards. Ellis testified that he advised Geier of Conklin's attendance issues as far back as May 2008, although the Plaintiff was not terminated until August 2008. (Ellis Dep., at 34.) Thus, this evidence can arguably be interpreted by a reasonable fact finder to show that Conklin's termination was not in fact based on his longstanding attendance issues but rather motivated, at least in part, as retaliation for his sexual harassment complaints. In addition, the Plaintiff points out that there are no written memoranda or letters in his file documenting any issues with his attendance, either in the summer of 2008 or during any other time period. Furthermore, the Plaintiff argues that Robert Cacciola, another warehouse employee, was never monitored by Ellis or disciplined by Geier, although he had similar attendance issues. Courts have consistently held that one way to establish a claim of retaliation is to show that the complaining employee is treated differently than other employees who did not engage in a protected activity. See Knight v. City of New York, 303 F. Supp. 2d 485, 498-99 (S.D.N.Y.

2004); see also DeCintio v. Westchester Cty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (holding that discrimination can be established "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct"). Therefore, the Court finds that the Plaintiff's *prima facie* case, along with these additional pieces of evidence, are sufficient to create a triable issue of fact as to whether the Defendants' articulated reasons for Conklin's termination are mere pretext.

With regard to Conklin's move to the warehouse initiated by Geier, even if the computer inquiry was unquestionably generated prior to the transfer so that it constitutes a legitimate reason for the reassignment, the fact that the computer report was then regenerated just one day after Conklin filed his May 15, 2008 formal complaint of sexual harassment against Wilson, provides circumstantial evidence that Conklin's alleged improper accessing of computer records dating back to January 9, 2007 was mere pretext for the Plaintiff's transfer or "demotion" to the BOE warehouse in April 2008. Further demonstrating a question of fact as to whether the move was pretext is that Geier's understanding of its impetus differs from that of BOE's Director of Operations Keith Tuthill and Warehouse Supervisor Bill Ellis. For instance, Tuthill testified that Geier told him that the reason why Mr. Conklin was moved to the warehouse was because he "wasn't coming to work. . . . that was the reason why he was moved." (Tuthill Tr. at 25.) See EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (identifying a fact issue where the defendant offered contradictory reasons during the course of administrative investigation). Viewing all of the disputed facts in this case in the light most favorable to the non-movant, these pieces of circumstantial evidence create an issue of pretext sufficient to defeat summary judgment. Cf. Dixon v. Int'l Federation of Accountants, 416 Fed App'x 107, 110-11 (2d Cir. 2011) ("Again, assuming *arguendo* that Dixon established a *prima facie* case of retaliation, her

poor work performance constituted a legitimate, non-retaliatory reason for her termination, and she fails to identify any evidence, apart from temporal proximity, to suggest that this reason was pretextual.").

In sum, there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of the Plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of retaliation. In addition, there is sufficient evidence to find that Defendant Geier, as Commissioner, was personally involved in the retaliation to be held liable under Section 1983 and NYSHRL. Therefore, the County Defendants' motion for summary judgment to dismiss the Plaintiff's retaliation claims, whether asserted through Title VII, Section 1983, or NYSHRL, is denied.

### 3. As to the Section 1983 Fourteenth Amendment Claims

With regard to the Section 1983 Fourteenth Amendment Claim asserted in the Complaint, the Plaintiff does not fully address a Fourteenth Amendment gender discrimination claim against any of the Defendants in his opposition papers. To the extent the Plaintiff continues to seek to pursue this claim, the Court finds that there are no facts alleged or evidence put forth that supports a claim of gender discrimination as a result of the claimed retaliatory actions taken by the County Defendants, including Geier. In any event, the Second Circuit has explained, albeit in the racial discrimination context, that no such cause of action exists. Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ("[a]lthough claims of retaliation are commonly brought under the First Amendment . . . and may also be brought under Title VII . . . we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."); see also Ratliff v. DeKalb County, 62 F.3d 338, 340–41 (11th Cir. 1995) (finding no established right under the equal protection clause to be free from retaliation for

complaints of gender discrimination); <u>Gray v. Lacke</u>, 885 F.2d 399, 414 (7th Cir. 1989) ("[R]ight to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."); <u>Lange v. Town of Monroe</u>, 213 F. Supp. 2d 411, 419 (S.D.N.Y. 2002) ("defendants' alleged retaliation in response to plaintiff's sexual harassment complaints is not cognizable as an equal protection violation.").

Accordingly, the Court dismisses the Plaintiff's claims asserted under the equal protection clause of the Fourteenth Amendment. To the extent the Plaintiff seeks to assert a Fourteenth Amendment claim against the County Defendants, including Geier, under the due process clause, the Court dismisses this cause as well, as there are no facts alleged or evidence put forth that supports a violation of any of the Plaintiff's due process rights.

### 4. Damages

Finally, the Court will assess the County Defendant's motion for summary judgment in connection with its arguments as to the Plaintiff's damages claims. The County Defendants contend that the Plaintiff's claims for punitive damages and for compensatory damages for physical and emotional distress are not recoverable under Title VII, citing <u>Carrerro v. New York City Housing Auth.</u>, 890 F.2d 569, 581 (1989) ("neither compensatory nor punitive damages are recoverable under Title VII") and <u>O'Brien v. King World Productions, Inc.</u>, 669 F. Supp. 639, 641 (1987) ("Because Title VII authorizes only equitable remedies, neither compensatory nor punitive damages are available under that law"). The Plaintiff, on the other hand, asserts that he has viable claims for damages for emotional pain and suffering, and compensatory damages, against the County Defendants under Title VII.

Despite the County Defendants' case precedent that indicates the contrary, this case law predates the amendments to Title VII contained in the Civil Rights Act of 1991, which expanded

the remedies available to a plaintiff. Thus, it is now clear that compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, [or] other nonpecuniary losses" are recoverable under Title VII. See Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001) (citing 42 U.S.C. § 1981a(b)(3)); see Cush-Crawford v. Adchem Corp., 271 F.3d 352, 356-57 (2d Cir. 2001); Skaggs v. Subway Real Estate Corp., No. 03 Civ. 1412, 2006 WL 1042337, at *5 (D. Conn. April 19, 2006). Therefore, the County Defendants' argument in this regard is without merit.

In addition, Conklin contends that he has viable punitive damages claims against the individual Defendant Geier. Geier acknowledges that such punitive claims may be asserted, but argues that because no evidence has been adduced that is sufficient to demonstrate her personal involvement in order find her individually liable, a necessary predicate to awarding punitive damages is lacking. The Court also finds this argument to be without merit. It is undisputed that Geier personally was responsible, at least in part, for both Conklin's move to the warehouse and his subsequent termination. Thus, because there is at least a question of fact as to whether she can be held personally liable under Section 1983, the Plaintiff may continue to assert a claim for punitive damages against her.

## C. As to the Summary Judgment Motion by the Defendant Wilson

The Court will now assess the Defendant Wilson's separate motion for summary judgment. The only claim that remains against Wilson is that she "aided or abetted" the BOE and the County in creating a hostile work environment and retaliating against the Plaintiff, in violation of NYSHRL § 296(6). Under the Human Rights Law, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the Human Rights Law], or to attempt to do so." N.Y. Exec. Law §

296(6). "By its terms, § 296(6) of the Human Rights Law creates a 'broad[ ] source of personal liability' that is not limited to employers or employees." Stanley v. Guardian Sec. Servs., Inc., 800 F. Supp. 2d 550, 557 (S.D.N.Y. 2011); Dantuono v. Davis Vision, Inc., No. 07 Civ. 2234, 2009 WL 5196151, at *13 (E.D.N.Y. Dec. 29, 2009) ("[U]nlike other sections of the [Human Rights Law], § 296(6) does not textually limit itself to employers — it states 'any person' can be liable for violations."). The Second Circuit has instructed that this provision allows, "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable under the NYSHRL" irrespective of whether that co-worker had authority to make personnel decisions. Feingold, 366 F.3d at 158 (quoting Tomka, 66 F.3d at 1317 n.19).

Thus, the Court must determine whether Wilson may be considered an "aider and abettor" of her own conduct under § 296(6). The Plaintiff alleges that Wilson acted as an aider and abettor under § 296(6) by engaging in the discriminatory conduct that produced a hostile work environment and subsequent retaliation. In 2008, another court in this district expressed skepticism for the notion that an individual could aid and abet his own discriminatory acts for purposes of personal liability under § 296(6). See Tully–Boone v. North Shore–Long Island Jewish Hosp. Sys., 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008) ("certain [c]ourts have cast doubt on the Second Circuit's interpretation of § 296(6) in Tomka . . . . As one [c]ourt noted, the Tomka formulation of the statute creates a strange and confusing circularity where the person who has directly perpetrated the [unlawful discrimination] only becomes liable through the employer whose liability in turn hinges on the conduct of the direct perpetrator."); see also Maher v. Alliance Mtg. Banking Corp., 650 F. Supp. 2d 249, 262 (E.D.N.Y. 2009).

Nevertheless, the law in this Circuit seems clear that a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions

serve as the predicate for the employer's vicarious liability.  However, as the employee's liability necessarily hinges on that of the employer, the employer must be held liable for an individual to also be held liable under this provision.  See Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) ("Importantly, since it is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting, a plaintiff cannot prevail against an individual on her state claims unless she can first establish the liability of her employer.") (internal citations omitted).

In the present case, Wilson cannot be held liable for aiding and abetting her own conduct in fostering a hostile work environment because as described above, the Plaintiff has failed to establish that his work environment was sufficiently severe as a matter of law.  Thus there is no predicate employer liability.  For this reason, the Defendant Wilson's motion for summary judgment is granted as to the claims of a hostile work environment.

With regard to the Plaintiff's claims of retaliation, Wilson first argues that Conklin has failed to demonstrate a primary violation by the County or the BOE, and for this reason, any aider and abettor claim against her must be dismissed.  However, as explained above, a genuine issue of material fact exists as to whether the County and the BOE violated the state human rights law by becoming a party to the retaliatory conduct.  If Conklin can prove a primary violation by these parties, then actions by Wilson may conceivably aid and abet that violation and subject her to liability under NYSHRL 296(6).

However, even if the Court were to assume that the predicate employer liability exists, Conklin's claim against Wilson under NYSHRL 296(6) nevertheless fails because Wilson did not participate in any of the alleged retaliatory actions taken against him.  She had no supervisory role and no control over the terms of the Plaintiff's employment.  See Pellegrini, 740

F. Supp. 2d at 356 ("this court concludes that [the employees'] alleged conduct in ignoring, writing off, discouraging, and failing to investigate Pellegrini's complaints could amount to acquiescence in and aiding and abetting of the creation of a hostile work environment. . . . There is no evidence, however, that [the employees] participated in any retaliatory conduct."). Cf. Int'l Healthcare Exchange, Inc. v. Global Healthcare Exchange, 470 F. Supp. 2d 345, 364 (S.D.N.Y. 2007) ("Whereas Brice set forth insufficient facts substantiating Viacom's participation in discriminatory conduct, Cuene has proffered evidence that, taken in the most favorable light, could reasonably convince a fact finder that Gaither actively participated in discriminatory conduct."); Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 215 (N.D.N.Y. 2002) ("With respect to the retaliatory termination claim, at the very least a factual question remains as to whether Beney and Barbagallo 'actually participated' in the decision to discharge plaintiff. Whether such participation was wrongful is for the jury to decide, and is not a matter for the court on summary judgment."); Lewis v. Triborough Bridge & Tunnel Auth., 77 F. Supp. 2d 376, 381–84 (S.D.N.Y. 1999) ("[T]he case law establishes beyond cavil that a supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation' under [NYSHRL] § 296(6).")

Therefore, the Defendant Wilson's motion for summary judgment is granted and all claims against her are dismissed.

## D.  As to the Summary Judgment Motion by the Defendant Garcia

Finally, the Court will address the motion for summary judgment filed by the Defendant Jesse Garcia.  Individual defendants may not be held personally liable for alleged violations of Title VII.  However, under certain circumstances, an employee such as Garcia may be held individually liable under Section 1983 and NSYHRL.  See Williams v. City of New York, No.

99 Civ. 2697, 2006 WL 2668211, at *26 (E.D.N.Y. Sept. 11, 2006) ("Individuals may be held liable under Section 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment."); Chamblee v. Harris & Harris, Inc., 154 F. Supp. 2d 670, 676–77 (S.D.N.Y. 2001) (noting that an employee may be held individually liable under NYSHRL if he has "sufficient authority and power to do more than simply carry out personnel decisions made by others"). Therefore, in turn, the Court will assess the Section 1983 and NSYHRL claims as against Garcia.

### 1. As to the Section 1983 Claims Against Garcia

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights. Ross v. Westchester Cnty. Jail, No. 10 Civ. 3937, 2012 U.S. Dist. LEXIS 3502, at *26, 2012 WL 86467 (S.D.N.Y. Jan. 11, 2012) (citing Martinez v. California, 444 U.S. 277, 285, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980)).

First, Conklin claims that Garcia unlawfully contributed and otherwise condoned retaliation against the Plaintiff because of his participation in protected activities in violation of the Plaintiff's First Amendment constitutional rights. Second, Conklin alleges that Garcia unlawfully contributed and otherwise condoned the discrimination and harassment and

unlawfully retaliated against the Plaintiff in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution.

"In the Second Circuit, personal involvement of the defendants in the alleged . . . retaliation is a prerequisite to an award of damages under section 1983." Appel v. Spiridon, No. 06 Civ. 1177, 2011 WL 3651353, at *13 (D. Conn. Aug. 18, 2011); see Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] § 1983.") (quotations and citations omitted)). Accordingly, "the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required." Al–Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989).

As stated by the Second Circuit, in describing what are known as the Colon factors, a supervisory defendant in a Section 1983 case may be held liable when:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

Id. However, the law surrounding supervisory liability under Section 1983 is in a current state of flux. As explained last month by a district court sitting in the Southern District of New York:

> courts in this Circuit are divided over the question of how many of the so-called Colon factors survive in the wake of [Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)]. Compare Martinez v. Perilli, No. 09 Civ. 6470, 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five Colon categories still apply after Iqbal."), with Bellamy v. Mount Vernon Hosp., 07 Civ. 1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009)

> ("Only the first and part of the third <u>Colon</u> categories pass <u>Iqbal</u>'s
> muster — a supervisor is only held liable if that supervisor
> participates directly in the alleged constitutional violation or if that
> supervisor creates a policy or custom under which unconstitutional
> practices occurred."), aff'd, 387 F. App'x 55 (2d Cir. 2010). Our
> Court of Appeals has not addressed the question directly yet, but it
> has indicated that at least some of the <u>Colon</u> factors other than
> direct participation remain viable. <u>See Rolon v. Ward</u>, 345 F.
> App'x 608, 611 (2d Cir. 2009) ("A supervisory official personally
> participates in challenged conduct not only by direct participation,
> but by (1) failing to take corrective action; (2) creation of a policy
> or custom fostering the conduct; (3) grossly negligent supervision,
> or deliberate indifference to the rights of others."); <u>see also Scott v.
> Fischer</u>, 616 F.3d 100, 108–09 (2d Cir. 2010). Moreover, it
> remains the case that "there is no controversy that allegations that
> do not satisfy any of the <u>Colon</u> prongs are insufficient to state a
> claim against a defendant-supervisor." <u>Aguilar v. Immigration
> Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.</u>,
> 811 F.Supp.2d 803, 815 (S.D.N.Y. 2011).

<u>Pratt v. Bloomberg</u>, No. 11 Civ. 8355, 2012 WL 1358770, at *2 (S.D.N.Y. Apr. 19, 2012).

Because it is unclear as to whether <u>Iqbal</u> overrules or limits <u>Colon</u>, the Court will continue to

apply the categories for supervisory liability as set forth in <u>Colon</u>.

Garcia argues that summary judgment must be granted because he had absolutely no

"personal involvement" in the employment acts giving rise to the Plaintiff's alleged

constitutional violations. In particular, Garcia contends that each of the alleged adverse

employment actions — including the transfer to the warehouse and the termination — were

taken by Commissioner Geier alone and not by himself. Moreover, Garcia asserts that Geier's

deposition testimony reveals that Garcia had no authority to transfer or terminate an employee.

(<u>See</u> Geier Dep., at 86, 102; Conklin Dep., at 218.) In addition, to the extent Conklin's

allegations are that Garcia failed to remedy the wrong or was grossly negligent, Garcia avers that

he had no power within the BOE to prevent Geier from carrying out her duties with respect to the

discipline of employees. On the other hand, the Plaintiff claims that Garcia may be held liable

under Section 1983 either for his direct participation in the retaliation or alternatively, for his failure to take remedial action when he received Conklin's complaints about Wilson. The Court will address each of these contentions in turn.

First, Garcia may be held liable under Section 1983 if he was personally involved in the constitutional violation by participating in it directly. "Because personal involvement is a question of fact, [the Court is] governed by the general rule that summary judgment may be granted only if no issues of material fact exist and the defendant is entitled to judgment as a matter of law." Farrell v. Burke, 449 F.3d 470, 483–84 (2d Cir. 1994) (internal quotation marks omitted).

As an initial matter, the Plaintiff alleges that Garcia had knowledge of Conklin's protected activities, by presenting evidence that (a) there was general corporate knowledge after Conklin's February 29, 2008 memorandum to the Sexual Harassment Officers asserting his allegations against Wilson; and (b) Conklin sent a complaint via email directly to Garcia on April 29, 2008, although Garcia denies ever having read it. (Pl. Ex. 16.) In addition, Garcia testified that he was aware of Conklin's intention to file a complaint of harassment against Wilson. (See Garcia Dep. at 49, 51 ("I think he told me he was going to file — he was going to file one . . . . That he was going to be filing a sexual harassment charge. . . . I listened. I told him if he felt victimized, to do it.").) Based upon the undisputed evidence, there does not appear to be a question of fact as to whether Garcia had some knowledge of Conklin's protected activities.

The next essential inquiry is whether there is a question of fact as to whether Garcia directly participated in any of the alleged retaliatory constitutional violations that Conklin complains of — namely, the transfer to the warehouse and his subsequent termination. Conklin

alleges several instances of Garcia's personal involvement. The first occurrence is when Conklin showed Garcia a copy of a draft sexual harassment complaint he was planning to file with the BOE, and Garcia supposedly became irate and threatened that if the complaint were to be filed, there would be consequences. In addition, Conklin alleges that Garcia warned him by stating "I know who each and every one of your friends are and where they work and . . . I'll get each one of them." (Conklin Dep., at 170, 229-30.) According to Conklin, Garcia reacted in this manner because he "wanted to keep [the Republican portion of the BOE] as one big happy family. He didn't want the turmoil." (Id. at 230.) Next, Conklin claims that when he requested Garcia to move him out of the warehouse, Garcia told him "You got to stay here for now. That's what they want you to do. You have to stay here for now." (Id. at 147.) Conklin also contends that Garcia threated his continued employment at the BOE by instructing him to interview elsewhere. (Id. at 147.) Garcia, for his part, denies raising his voice with the Plaintiff during their May 2008 conversation and also denies that he advised Conklin against filing his complaint.

The Second Circuit has held that a valid First Amendment retaliation claim requires a showing that, among other things, the complained of act "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 227 (2d Cir. 2006) (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). This is an objective standard, and thus the motives of the person taking the putative retaliatory action are immaterial. See Chamberlin v. Principi, 247 Fed. App'x 251, 254–55 (2d Cir. 2007) (citing White, 548 U.S. at 2415–16).

In the instant case, Conklin's allegations against Garcia as to his personal involvement only amount to discouragement and/or threats regarding the filing of a formal sexual harassment

complaint against Wilson. These threats, even if true, are insufficient to constitute an adverse employment action and thus are insufficient to demonstrate Garcia's personal involvement. <u>See</u> <u>Gross v. Home Depot U.S.A., Inc.</u>, 386 F. Supp. 2d 296, 298 n.2 (S.D.N.Y. 2005) ("With respect to her retaliation claim, Plaintiff has accused Buchanan of, at most, threatening to retaliate against her, but a threat of retaliation, by itself, does not constitute an adverse employment action."); <u>see also Kincheloe v. Caudle</u>, No. 09 Civ. 10, 2009 WL 3381047, at *16 (W.D. Tex. Oct. 16, 2009) ("verbal threats of termination and criticism have been held not to rise to the level of an adverse employment action."). Moreover, to the extent Conklin is claiming that Garcia directly participated in the retaliatory actions by merely ignoring his complaints, being ignored "certainly does not rise to the level of an adverse employment action." <u>Magilton v. Tocco</u>, 379 F. Supp. 2d 495, 507 (S.D.N.Y. 2005).

Furthermore, Conklin has not put forth any evidence that Garcia actually participated in any of the potentially recoverable retaliatory actions allegedly taken against Conklin, <i>i.e.</i>, the transfer to the warehouse or his termination. (<u>See</u> Conklin Dep., at 308 ("I don't know who transferred me to the warehouse.); <u>id.</u> at 313 ("[Garcia] would never put in a letter to someone saying they are fired. He wouldn't leave a signature on it. The signature would be from the Commissioner.").) After "discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case." <u>Davis v. Kelly</u>, 160 F.3d 917, 921 (2d Cir. 1998); <u>see also</u> <u>Neitzke v. Williams</u>, 490 U.S. 319, 324 n.2, 109 S. Ct. 1827, 1831 n.2 (1989) (affirming Court of Appeals' finding that plaintiff in a § 1983 action "alleged no personal involvement on the part of three . . . defendants . . . and that these defendants' prison jobs did not justify an 'inference of personal involvement . . .'"); <u>Williams v.</u>

Smith, 781 F.2d 319, 324 (2d Cir. 1986) (defendant "documented his assertion of no personal involvement [and plaintiff] offers no concrete evidence to the contrary").

Finally, to the extent that Conklin's claims are premised on any conversations that Geier had with Garcia prior to making her determinations regarding Conklin's transfer or termination, that would similarly not suffice for Garcia's personal involvement to render him liable under Section 1983. "Involvement in discussions that lead to a decision is not personal involvement under § 1983." Zdziebloski v. Town of East Greenbush, N.Y., 336 F. Supp. 2d 194, 202 (N.D.N.Y. 2004).

Therefore, to the extent the Plaintiff's Section 1983 First Amendment retaliation claim against Garcia is premised on his personal involvement, summary judgment dismissing that claim is granted.

Second, the Plaintiff also premises his Section 1983 First Amendment claim against Garcia based on Garcia's failure to remedy Wilson's wrongs. Conklin claims that he complained to Garcia on numerous occasions but that Garcia failed to take any remedial action, such as by progressively disciplining Wilson for her behavior. Garcia does not dispute that Conklin spoke to him about his grievances with Wilson's behavior, but claims that he had no power to institute any remedial action.

An analysis of whether Garcia failed to remedy Conklin's complaints to potentially subject him to liability hinges on whether Garcia had supervisory authority over Conklin and Wilson. If he did not, then he cannot be held liable under Section 1983 for failure to take remedial action upon receiving Conklin's complaints, because he would have had no power to remedy any grievances. If, however, Garcia did have the ability to take remedial action because of his supervisory role, then Garcia's summary judgment motion on that ground should be

defeated. Of course, the fact that Garcia "was in a high position of authority is an insufficient basis for the imposition of personal liability." McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977) (noting the need for additional evidence, such as participation in relevant hearings, knowledge of wrongdoing, or direct responsibility or control), cert. denied, 434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978). However, as it is undisputed that Conklin complained to Garcia and thus Garcia had knowledge of the claimed wrongdoing, Garcia's ability to impose punishment would be sufficient at this stage to substantiate the allegations of personal liability.

Conklin argues that summary judgment is inappropriate with regard to Garcia because there are questions of fact as to whether he exercised supervisory authority and presumably could institute remedial action. First, the Plaintiff asserts that the "main issue of fact that precludes summary judgment" is Garcia's title, because according to Conklin, Garcia also had the status of "Elections Administrator", in addition to his undisputed title of Hispanic Outreach Coordinator with the BOE. The Plaintiff relies on the BOE's roster records and organizational chart, as well as Geier's testimony, in which she indicates that Garcia possibly could have been Elections Administrator but was not certain of his proper title. (See Geier Dep., at 18, 37.) The Plaintiff also argues that while Garcia may not have technically been a supervisor at the BOE, he had *de facto* supervisory authority.

According to Conklin, as a practical matter, Garcia's political position with the Town of Brookhaven as its Republican Chair enabled him to have broad powers within the BOE. For instance, the Plaintiff alleges in a conclusory manner that Garcia's powers included effectuation of promotions; controlling BOE workers' terms and conditions of employment; and countermanding and cancelling personnel actions ordered by the Commissioner, such as transfers and terminations. However, other than the BOE's roster records which simply list Garcia

alongside the title of "Elections Administrator", the Plaintiff can offer no evidence to demonstrate Garcia's broad supervisory powers other than his own testimony and allegations. In response, Garcia alleges that his separate position as Brookhaven Town Republican Leader is completely irrelevant because he had no duty or responsibility to act on behalf of the Plaintiff at the BOE because of this additional position. Moreover, Garcia alleges that no one reported to him at the BOE and that he never held the title of "Elections Administrator."

Even if Garcia did have the title of "Elections Administrator", the Plaintiff does not appear to dispute that Garcia had no official power to affect the terms and conditions of his or Wilson's employment. In essence, Conklin claims that Garcia had only practical *de facto* supervisory authority and that this gave him the power to take remedial action in response to Conklin's complaints about Wilson. When asked in his deposition what Garcia did for him when he complained, Conklin responded:

> He would speak to her sometimes. He would speak to her sometimes, and in a way he was wearing two hats, one as the Director of Hispanic Outreach and the other one as the Brookhaven Republican Chairman. So he was my boss or Denise's boss in two different ways, because if one wanted to get a promotion or get a raise there and he wasn't happy with you, he would recommend that as the Chairman . . . so you went through your Chairperson to get a promotion or another placement of some kind.

(Conklin Dep. at 302.) Conklin admitted in his deposition that Garcia could only affect promotions or the like indirectly and informally through a recommendation, because he did not have the actual authority to promote anyone directly. (Id. at 303-04.) With regard to discipline and punishment, Conklin claims that Garcia had disciplined and punished employees in the past, "if someone wasn't doing their job there, or if someone wasn't doing their job politically and then they got denied for a move up or promotion", but that Garcia would not tell the person directly because "in the pecking order, . . . to the outside world, he didn't have the authority for

45

that." (Id. at 304-05.) Conklin further admitted that while Garcia had the ability to make a recommendation, all actions would be taken through a Commissioner or Deputy Commissioner, not Garcia. (Id. at 307.)

Further, in attempting to provide examples of the type of remedial action that Garcia could have taken, Conklin only stated vaguely in his deposition that "they weren't doing anything about it. They wouldn't escalate the punishment, other than talking to her. There was never any letter put in her file. There was never 'go home early' or 'punch out' or 'you're going to get suspended.'" (Conklin Dep. at 190, 300.) Thus, these statements of possible remedial action were not made specifically with regard to Garcia, but rather the BOE supervisory personnel in general. Of importance, Conklin has not set forth a single piece of evidence to demonstrate that Garcia was even capable of remedial action, other than his own generalized assertions. (Cf. Geier Dep. at 40:7-13 (Q: Are you aware of any employees on the Republican side of the Board of Elections that reported directly to Mr. Garcia? A: No.").) Conklin merely asserts about what Garcia hypothetically could have done, without any evidentiary support. (See Conklin Dep. at 308 ("I don't know who transferred me to the warehouse . . . Because [Garcia] is Number 3 in the pecking order, and as my Brookhaven Republican Chairman, he *could have* intervened.") (emphasis added).)

Therefore, the Court finds that the Plaintiff has not put forward sufficient evidence to raise a triable issue of fact as to whether Garcia had official supervisory authority or *de facto* supervisory authority over Wilson or Conklin. See Washington Square Post # 1212 Am. Legion v. New York, 720 F. Supp. 337, 343 (S.D.N.Y. 1989) ("A non-moving party may not rely on mere conclusory allegations but must set forth 'concrete particulars.'"), rev'd on other grounds, 907 F.2d 1288 (2d Cir. 1990). Notably, the Court's analysis does not rely upon assessments of

credibility, which the Court may not do at the summary judgment stage.  See Kaytor v. Electric

Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) ("In reviewing the evidence and the inferences that

may reasonably be drawn, the court may not make credibility determinations or weigh the

evidence." (internal quotations and emphasis omitted)).

Even if the Court were to assume, for purposes of the present motion, that Garcia was an

"Elections Administrator" with the BOE and credit all of Conklin's deposition testimony, his

contentions boil down to the allegation that Garcia had the power to influence the Commissioner

or Deputy Commissioner on how to act.  However, an official with no "hiring, firing, or

disciplinary power over any supervisory staff or personnel . . . [or] no direct power to control or

direct the customs and policies of the [workplace]" has no personal involvement in the

unconstitutional conduct, and a claim under § 1983 cannot be sustained as to that individual.

Morris v. Eversley, 282 F. Supp. 2d 196, 207 (S.D.N.Y. 2003) (citing Brody v. McMahon, 684

F. Supp. 354, 356 (N.D.N.Y. 1988)); see also Van Pelt v. Finn, No. 92 Civ. 2977, 1993 WL

465297, at *7 (S.D.N.Y. Nov.12, 1993) (finding no personal involvement where defendants

acted as advisors, rather than supervisors).  "When an individual 'does not have any say over

supervisory decisions,' summary judgment is warranted, because personal involvement is

lacking."  Morris, 282 F. Supp. 2d at 207 (quoting Walker v. Pataro, No. 99 Civ. 4607, 2002 WL

664040, at *14–15 (S.D.N.Y. Apr. 23, 2002)); see also Ramos v. Artuz, No. 00 Civ. 0149, 2003

WL 342347, at *12 (S.D.N.Y. Feb. 14, 2003) (granting summary judgment where defendant

Regional Health Services Administrator did not supervise the health care providers alleged to

have violated plaintiff's constitutional rights).

In sum, even if Garcia was aware of Conklin's complaints of harassment, he cannot be

held liable under Section 1983.  Saar v. U.S. Dep't of Justice, 705 F. Supp. 999, 1006 (S.D.N.Y.

1989) (finding that where "Plaintiff has not contradicted defendant" supervisor's assertion that "he had no power to act to remedy the violation," § 1983 claim against that defendant dismissed). Thus, the Defendant Garcia's motion for summary judgment dismissing the Plaintiff's claims against him based on Section 1983 First Amendment retaliation, is granted.

With regard to the Section 1983 Fourteenth Amendment claim against Garcia, the Court notes that Plaintiff does not address a Fourteenth Amendment gender discrimination claim against Garcia in his opposition papers. To the extent the Plaintiff continues to seek to pursue this claim, the Court finds that there are no facts alleged or evidence put forth that supports a claim of gender discrimination by Garcia. In any event, the Second Circuit has explained, albeit in the racial discrimination context, that no such cause of action exists. Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ("[a]lthough claims of retaliation are commonly brought under the First Amendment . . . and may also be brought under Title VII . . . we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."); see also Ratliff v. DeKalb County, 62 F.3d 338, 340–41 (11th Cir. 1995) (finding no established right under the equal protection clause to be free from retaliation for complaints of gender discrimination); Gray v. Lacke, 885 F.2d 399, 414 (7th Cir. 1989) ("[R]ight to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."); Lange v. Town of Monroe, 213 F. Supp. 2d 411, 419 (S.D.N.Y. 2002) ("defendants' alleged retaliation in response to plaintiff's sexual harassment complaints is not cognizable as an equal protection violation.").

The Court thus dismisses the Plaintiff's claim against Garcia asserted under the equal protection clause of the Fourteenth Amendment. To the extent the Plaintiff seeks to assert a Fourteenth Amendment claim against Garcia under the due process clause, the Court dismisses

this as well, as there are no facts alleged or evidence put forth that supports a violation by Garcia of any of the plaintiff's due process rights.

### 2. As to the NYSHRL Claim Against Garcia

For the reasons set forth in the context of the Section 1983 claim above, the Court finds that there are no allegations that Garcia actively participated in any of the alleged retaliatory actions taken against the Plaintiff. Moreover, Conklin's claim against Garcia under NYSHRL 296(6) does not survive because although "a supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation' under [NYHRL] § 296(6)", Lewis v. Triborough Bridge and Tunnel Auth., 77 F.Supp.2d 376, 384 (S.D.N.Y. 1999), the Plaintiff cannot demonstrate that Garcia qualifies as a supervisor.

Therefore, Garcia's motion for summary judgment is granted in its entirety and the complaint against him is dismissed.

### III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the County Defendants' motion for summary judgment with regard to the Plaintiff's hostile work environment claims is granted, but that the County Defendants' motion for summary judgment with regard to the Plaintiff's retaliation claims is denied; and it is further

**ORDERED** that the Defendant Wilson's motion for summary judgment is granted in its entirety; and it is further

**ORDERED** that the Defendant Garcia's motion for summary judgment is granted in its entirety; and it is further

ORDERED that the parties are directed to appear before the Court on May 22, 2012 at 9:00 am for a pre-trial conference in Courtroom 1020. Counsel shall have the authority to discuss settlement at this conference.

**SO ORDERED.**

Dated: Central Islip, New York
May 3, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge